UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/22/06

------------------------------------------------------------x

STRATEGIC VALUE MASTER FUND, :
LTD. and MAN MAC 3 LIMITED,

                             :

                Plaintiffs,

                             :

- against -

                             :

CARGILL FINANCIAL SERVICES,
CORP. :

                             :

                Defendant.

------------------------------------------------------------x

**OPINION AND ORDER**

05 Civ. 8546 (PKL)

## APPEARANCES

BOIES, SCHILLER & FLEXNER LLP
570 Lexington Avenue
New York, New York 10022
David A. Barrett, Esq.
Magda M. Jimenez, Esq.

Attorneys for Plaintiffs

FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55408
Randall E. Kahnke, Esq.
Deborah A. Ellingboe, Esq.
Michael M. Krauss, Esq.
Nathaniel J. Zylstra, Esq.
Jacob J. Sullivan, Esq.

Attorneys for Defendant

**LEISURE, District Judge:**

This action arises out of the purported sale by defendant Cargill Financial Services Corporation, a Delaware corporation, of an equity stake in Teesside Power Ltd., one of the largest power plants in the United Kingdom, to plaintiff hedge funds Strategic Value Master Fund, Ltd. and Man Mac 3 Limited, Cayman Islands and Bermudan corporations, respectively. Plaintiffs allege that the parties entered into an oral contract, under which defendant promised to sell a 50% equity stake in Teesside Power Ltd. to plaintiffs for £19MM. They further allege that the parties subsequently modified the contract orally, when defendant agreed to instead sell to plaintiffs a lesser equity stake of 35% for £13.3MM. Plaintiffs claim that defendant breached this contract when it refused to transfer the equity to plaintiffs. Defendant now moves for dismissal of plaintiffs' complaint on *forum non conveniens* grounds, arguing that this dispute is wholly centered in England and, consequently, an English court provides the most appropriate forum. For the reasons set forth below, defendant's motion is granted and the case is dismissed, subject to certain conditions imposed on defendant.

## BACKGROUND

I.  Factual Background

A.  The Parties

Plaintiffs Strategic Value Master Fund, Ltd. and Man Mac 3 Limited are hedge funds incorporated in the Cayman Islands and Bermuda, respectively. (Compl. ¶¶ 3-4; Pl.'s Mem. Law Opp'n Mot. at 3.) Strategic Value Partners, LLC ("SVP"), a Delaware limited liability company and nonparty to this action, is plaintiffs' investment advisor and manager. (Clarke Decl. ¶ 3; Khosla Decl. ¶¶ 1, 4.) SVP is registered to do business in New York; it maintained a principal place of business in New York at the time of the events giving rise to this action. (Khosla Decl.

¶¶ 4-5.) SVP and plaintiffs are parties to a contract, under which SVP maintains full discretionary authority over plaintiffs' investment activities, which authority includes negotiating and closing trades, entering into and enforcing contracts, deciding how the investment funds should be allocated, and pursuing investment-related litigation, all on plaintiffs' behalf. (Khosla Decl. ¶ 6.) SVP has a "sub-advisory relationship" with Strategic Value Partners (U.K.), LLP ("SVP-U.K."), an indirect subsidiary of SVP. (Khosla Decl. ¶ 10.) SVP-U.K.'s primary function is to research and analyze potential investment opportunities in Europe for SVP's hedge funds. (Khosla Decl. ¶ 10.) Due to SVP's exclusive relationship with plaintiffs, SVP-U.K. is prohibited from making any investments on behalf of plaintiffs without SVP's express instruction. (Khosla Decl. ¶ 10.)

Defendant Cargill Financial Services Corp. ("CFSC"), a Delaware corporation with a principal place of business in Minnesota, is a full service financial services company with expertise in the investment in and trading of distressed assets. (Brice Decl. Ex. A.) Cargill Financial Markets Plc ("CFM"), an affiliate of CFSC, is an English company with its principal place of business in Cobham, Surrey, England. (Brice Decl. ¶ 2.) CFM, like CFSC, operates in the high yield and distressed asset investment market, albeit in Europe. (Brice Decl. ¶ 4.) CFSC and CFM are parties to a "Service Level Agreement," dated February 1, 2003, under which CFSC is given the right to broker trades in distressed assets, and provide accounting and administrative services related to such trades, on CFM's behalf. (Brice Decl. Ex. A.)

### B. The Power Plant

#### 1. Equity

Teesside Power Ltd. ("TPL"), one of the United Kingdom's largest power plants, was, at the time of the events giving rise to this action, privately held by five shareholders, all of whom

are English: Teesside Power Holdings Ltd. ("TPHL"); Midlands Power (TPL) Ltd. ("Midlands"); Northern Electric Generation (TPL) ("Northern"); South Wales TPL Investments Ltd. ("South Wales"); and Western Power Investments Ltd. ("Western").[1] (Brice Decl. ¶ 11; Davies Decl. ¶ 14.) TPHL, by reason of its 50% equity interest in TPL, is TPL's largest shareholder.[2] (Davies Decl. ¶ 14.)

The relationship of TPL vis-à-vis its shareholders, and the relationship among the shareholders themselves, are governed by TPL's Articles of Association ("Articles"). (Davies Decl. ¶ 12.) Among other terms, the Articles include certain preemption provisions that restrict generally a shareholder's ability to sell its equity to a third party. (Davies Decl. ¶ 16.) A TPL shareholder can enforce the Articles' terms against another TPL shareholder, or any prospective TPL shareholder that does not comply with the Articles' requirements. (Davies Decl. ¶ 18.) The shareholders are also governed by an equity agreement that has been supplemented a number of times ("Equity Agreement"). (Davies Decl. ¶ 19.) The parties to the Equity Agreement are the shareholders, TPL itself, and the agent bank, which represents TPL's bank lenders. (Davies Decl. ¶ 19.) Generally speaking, the Equity Agreement, like the Articles, imposes restrictions on a shareholder's ability to transfer its TPL equity. (Davies Decl. ¶ 20.) Finally, the shareholders are parties to a shareholders agreement that imposes additional restrictions on the transferability of TPL equity ("Shareholders Agreement"). (Davies Decl. ¶26.)

---

[1] The declaration of Rhodri Davies, defendant's expert on English law, states that Magnolia Power (TPL) Ltd. ("Magnolia"), and not Midlands Power (TPL) Ltd. ("Midlands"), was one of TPL's five shareholders at the time of the events giving rise to this action. (Davies Decl. ¶ 14.) The Court will assume this is an error, as it is the only reference to Magnolia. Regardless, Mr. Davies's declaration states that, since the time of the events giving rise to this action, TPHL has acquired Magnolia's 19.23% equity interest in TPL. (Davies Decl. ¶ 32.)

[2] TPHL also owns 100% of the preference shares of TPL. (Davies Decl. ¶ 14.)

3

### 2. Debt

TPL issued £795MM of debt to various bank lenders in order to finance the construction of the power plant. Today, the debt has a face value of approximately £500MM. (Brice Decl. ¶ 13.) After a downturn in the United Kingdom's wholesale power generation market, and the collapse of Enron in 2001, a number of TPL's debt holders sold their debt at discounted prices to, largely, hedge funds, including SVP-managed funds, and the proprietary trading desks of London-based investment banks. (Brice Decl. ¶ 14.) Because the debt holders' rights are governed by a contract entitled the "Amended and Restated Credit Agreement," the debt is commonly referred to as the "ARCA debt." (Clarke Decl. ¶ 9.) The ARCA debt is syndicated to various entities by Barclays Bank Plc. (Brice Decl. ¶ 13.)

### C. CFM's Interest in TPL

CFM has an indirect interest in certain TPL equity. CFM's interest in TPL stems from its purchase of certain notes issued by Teesside Power Finance Ltd. ("TPFL"), a Cayman Islands company, in July 1999 (the "Notes"). (Davies Decl. ¶ 31.) The Notes' present approximate face value is £80MM. (Brice Decl. ¶ 8.) The Notes are securitized by guarantees from two English companies, Enron Europe Power 1 Ltd. ("EEP1") and Enron Europe Power 3 Ltd. ("EEP3"). EEP1's guarantee is supported by a first ranking charge over its 85% interest in TPHL; EEP3's guarantee is supported by a floating charge over its assets, which includes its 15% interest in TPHL. (Davies Decl. ¶ 31.) Consequently, part of the securitization of the Notes is a 100% security interest in TPHL. (Davies Decl. ¶ 31.) Because TPHL owned 50% of TPL's equity at the time of the alleged contract formation,[3] CFM maintained, and still maintains today, an indirect security interest in TPL. (Brice Decl. ¶ 5; Def.'s Mem. Law Supp. Mot. at 5.) The

---

[3] Again, TPHL today holds an additional 19.23% of TPL's stock. (Davies Decl. ¶ 32.)

Notes are currently in default, but the trustee, Deutsche Trustee Company Limited ("Trustee"), has not exercised its default rights. (Brice Decl. ¶¶ 8-9.)

D. TPL's Shareholders and Creditors Seek to Gain Control Over All of TPL's Equity

In 2004, the ARCA debt holders began negotiations with TPL's shareholders to purchase their TPL stock. (Brice Decl. ¶ 16.) When these negotiations failed, the ARCA debt holders tried to procure the shareholders' equity by attempting to exercise a power of sale of the equity by auction pursuant to the Equity Agreement—in essence, a forced debt for equity swap. (Brice Decl. ¶ 16; Davies Decl. Ex. E.) In response, TPHL, as a TPL shareholder, brought suit in the English High Court to stop the sale by auction and won. The court held that the ARCA debt holders could not bid in the forced auction or any subsequent auctions. (Brice Decl. ¶ 16.) Defendant claims that, after the court's disposition of the matter, the ARCA debt holders created "additional trouble" by arguing that certain payments made to the shareholders pursuant to the Shareholder Agreement, and other governing agreements, were made illegally. (Brice Decl. ¶ 17.) While not much detail is provided, the relevant declaration states that court intervention was sought and the TPL shareholders won again. (Brice Decl. ¶ 17.)

The ARCA debt holders made an argument in the first trial that is relevant to the history of this case. (Brice Decl. ¶ 20.) The ARCA debt holders argued that extracting the equity from TPL's shareholders was necessary because TPL was not being managed properly, largely due to the fact that TPL, a project finance company with only three employees outside of its Board of Directors, was being ineffectively managed and governed by the shareholders vis-à-vis their representatives on the Board of Directors. (Brice Decl. ¶ 19.) While they lost the suit, the trial judge "noted and advised TPHL and CFM that they should address the management issues with the ARCA lenders to avoid further conflict given that the lenders were still owed a large sum by

5

TPL." (Brice Decl. ¶ 20.) Thereafter, CFM and TPHL began working on consolidating the TPL equity with the goal that TPL be managed and operated with a single voice. (Brice Decl. ¶ 20.)

CFM's John Brice and Greg Belonogoff began contacting representatives of the various shareholders, and in so doing, learned that certain ARCA debt holders, including SVP, Goldman Sachs, and Deutsche Bank, had also contacted the TPL shareholders to discuss purchasing their equity. (Brice Decl. ¶ 21.) Notwithstanding the ARCA debt holders' conversations with the TPL shareholders, defendant states that TPHL reached "agreements in principle" in March 2005 with the parent companies of Northern and Midlands to buy their respective equity stakes in TPL. (Brice Decl. ¶ 22.) Defendant also maintains that while TPHL had not yet reached an agreement with Western, discussions with that shareholder had been ongoing. (Brice Decl. ¶ 22.)

E.     The Alleged Oral Agreement

On April 7, 2005, Rory O'Neill, a portfolio manager at CFSC,[4] called Victor Khosla, SVP's Managing Partner, to discuss a potential sale of equity in TPL. (Khosla Decl. ¶ 11; Def.'s Mem. Law Supp. Mot. at 7.) (Messrs. Khosla and O'Neill had known each other for a number of years, having previously worked on a number of investments together. (Khosla Decl. ¶ 11.)) The conversation was preliminary, and the parties did not reach any agreement.

The following day, Messrs. O'Neill and Khosla had a number of conversations, as evidenced by transcripts of the phone calls. In a preliminary phone call, Mr. O'Neill told Mr. Khosla that defendant had agreements with "two guys," ostensibly Midlands and Northern, to purchase their TPL equity, and that defendant had backed out of any sale with Western. (Barrett Decl. Ex. 22 at 8.) Mr. Khosla communicated to Mr. O'Neill that he was not looking to purchase

---

[4] Mr. O'Neill is no longer employed by CFSC. (Pl.'s Mem. Law Opp'n Mot. at 4 n.7.)

6

a controlling number of TPL equity, but, instead, only 10%-15% of defendant's TPL equity. (Barrett Decl. Ex. 22 at 9.)

In a subsequent conversation, Mr. O'Neill conveyed to Mr. Khosla that, "no matter what happens" with the purchase of Western's equity, defendant would have control of TPL. (Barrett Decl. Ex. 24 at 5.) He went on to say that he was in the closing process of entering into agreements with Midlands and Northern to purchase their equity, and that if either of those two sellers were to tell CFSC that it would not sell its equity to defendant because SVP had made a higher bid, defendant would not consent to the transfer of the sellers' equity to SVP. (Barrett Decl. Ex. 24 at 5.)

In the final call between Mr. Khosla and Mr. O'Neill on April 8, 2005, Mr. O'Neill called Mr. Khosla again and stated that it was "our inclination . . . to sell[,] you know[,] the whole . . . 50%" of its interest in TPHL. (Krauss Ex. 6 at 2.) He went on to say that "we haven't fully thought through the mechanisms and the ramifications in the structures and all that," to which Mr. Khosla stated that "[t]he structures on this are pretty damn complicated." (Krauss Ex. 6 at 2.) Mr. Khosla then asked Mr. O'Neill, "can we kind of do a trade tonight subject to kind of working through the dots and so on and I think, you know, look we all do, we all know that we can work though those over time." (Krauss Ex. 6 at 3.) Mr. Khosla then asked whether this was too hard, and Mr. O'Neill said that it was, given that his colleague, Mr. Belonogoff, who was the "point" person on the deal, was unavailable. (Krauss Ex. 6 at 3.) The back and forth continued, and Mr. Khosla asked, "[s]o would you do all 50% tonight?," to which Mr. O'Neill responded, "I think so." (Krauss Ex. 6 at 4.) Mr. Khosla then asked what the price would be and Mr. O'Neill cited a price of £5.75 million for "15% of the company." (Krauss Ex. 6 at 4.)

Mr. O'Neill then told Mr. Khosla that the TPHL structure is the "mechanism by which we own the economic interest in those shares." (Barrett Decl. Ex. 25 at 5.) He then asked Mr. Khosla whether he "underst[ood] we don't own them directly?," to which Mr. Khosla said, "I do and I don't." (Barrett Decl. Ex. 24 at 5.) Mr. O'Neill explained that there was a pretty complicated structure, but that "we are the economic beneficiary of those shares." (Barrett Decl. Ex. 24 at 5.) Mr. Khosla, in response asked, "[c]an you, do you have the benefit to kind of really do anything you want with the shares? In other words, there is nothing which restricts its ability to be a shareholder[,] so to speak[,] on it?," and Mr. O'Neill responded by saying, "[n]ot really," and that the shares were "held by a legal entity upon which Cargill has one board member." (Barrett Decl. Ex. 24 at 5-6.) Mr. O'Neill further stated that "we are one board member of those entities" but that "we are clearly the economic driver behind much of what goes on there, but we don't have, you know, Rory O'Neill doesn't have the specific authority to trade." (Barrett Decl. Ex. 24 at 6.)

After referencing the litigation between the ARCA debt holders and the TPL shareholders, Mr. O'Neill confirmed that "we still own 100% of the bonds of this company called, you know, T[eess]ide Power Holdings Limited," such that "our economic stake hasn't changed at all." (Krauss Ex. 6 at 8.) He went on to state that "I can commit to you that Car[gill] will do best endeavors to make that trade go through. But, you know, don't forget if that entity starts selling the other shares then the other shareholders . . . . You know, so it will be messy, but I think at the end of the day, you know, we can probably deliver them to you." (Krauss Ex. 6 at 9.) Mr. O'Neill specifically mentioned Western as a "difficult breed," and that if TPHL is delivering the shares to SVP, "they've [*i.e.*, Western] got consent." (Krauss Ex. 6 at 9.) Mr.

Khosla conceded that "how you unlock the equity in this, is a very, very messy[,] dirty proposition." (Krauss Ex. 6 at 10.)

The conversation went on and Mr. Khosla stated, "Rory, 19 [million] pounds, we will buy it. What I would like to kind of do is on Monday we should just kind of work through the dots," to which Mr. O'Neill responded by saying "[o]kay." (Krauss Ex. 6 at 14-15.) Mr. Khosla then stated that he recognized that the stock shares were pretty complicated, but that "come hell or high water, we will work with you," noting "it is pretty hard to just buy it." (Krauss Ex. 6 at 15.) Mr. Khosla suggested that Jason Clarke, an employee of SVP-U.K., speak to someone at Cargill to follow through. (Krauss Ex. 6 at 15.) Noting that the equity "had all sorts of Enron claims and everything else," Mr. O'Neill told Mr. Khosla that it would "seek to" sell to SVP the "direct shares." (Krauss Ex. 6 at 16.) Mr. Khosla then agreed. (Krauss Ex. 6 at 16.) Messrs. Khosla and O'Neill final exchange was as follows:

> Mr. O'Neill: Okay, so we've got an agreement in principal subject to figuring out the details.
> Victor [Khosla]: Exactly, and we start figuring them out first thing Monday morning.
> Mr. O'Neill: We will start figuring them out Monday morning and Gage and Cargo will be calling and you are taking the 50% of the equity that we have indirect control over for 19 [million pounds], 19 [million pounds] even, there is the break.
> Victor [Khosla]: Yes, I got 160,000 pounds off you.
> Mr. O'Neill: Well it is for the advice you gave me.

(Krauss Ex. 6 at 45-46.)

## F. Subsequent Conversations and the Alleged Amended Oral Agreement

On April 13, 2005, CFM discovered that Mr. Clarke, of SVP-U.K., had met with Northern representatives the day before for the purpose of discussing the purchase of Northern's equity in TPL. Defendant argues that this meeting was in violation of plaintiffs' prior agreement on April 8 not to pursue the purchase of either Northern's or Western's equity. (Brice Decl. ¶

9

27.) CFM learned of this from a letter written by Northern informing CFM that it would not proceed with its sale to TPHL. (Brice Decl. ¶ 27.) Mr. Clarke states in his declaration that he was invited to a breakfast meeting on April 12, 2005 by Eric Connor of Northern, and that at the meeting Mr. Connor told him that it did not have an agreement to transfer its equity to Cargill, and then invited SVP to bid on Northern's TPL equity. (Clarke Decl. ¶ 22.) SVP declined to bid on Northern's equity. (Clarke Decl. ¶ 22.)

On April 13, 2005, Messrs. Khosla, O'Neill, Belonogoff, and Brice had a heated discussion in which the Cargill employees told Mr. Khosla that defendant had an "agreed deal" with Northern, including the price and terms of the deal (Barrett Decl. Ex. 27 at 5), but that they had received a letter that day from Northern saying the trade was off (Barrett Decl. Ex. 27 at 10). The Cargill employees went on to say that their understanding of the Shareholder Agreement gave them "the last look on the equity or we will be able to frustrate any person buying it who is not an existing shareholder." They made clear that while this point was subject to debate, Cargill would be willing to litigate over it. (Barrett Decl. Ex. 27 at 4.)

Later that day, Mr. Khosla called Mr. O'Neill separately. Mr. O'Neill told Mr. Khosla that defendant's sale of equity to plaintiffs was not off, notwithstanding SVP's interference with the trade between defendant and Northern. (Krauss Decl. Ex. 9 at 5-6.) The following exchanged then occurred:

> Victor [Khosla]: You still want to go on 35%?
> Mr. O'Neill: What's that?
> Victor [Khosla]: You thought you had 35% when you sold me the 50.
> Mr. O'Neill: Yes.
> Victor [Khosla]: Here is the point, if you don't get the Northern trade for whatever reason, right?
> Mr. O'Neill: Yes.

10

> Victor [Khosla]: You are going to take the 50% and move it down to 35%. If you get the Northern trade then you are just going to kind of[,] you know[,] do the 50% with us, is that fair?
>
> Mr. O'Neill: I think it is fair. Let me think about it, but, yeah.

(Krauss Decl. Ex. 9 at 6.) Mr. O'Neill then reiterated that it was not using any interference with the Northern trade to "back out of the trade with you." (Krauss Decl. Ex. 9 at 6-7.) He then said, "let me think through it, because I've got like a million things going on right now, one of which being in a discussion with my boss about raising outside money." (Krauss Decl. Ex. 9 at 7.)

## II. Procedural History

Plaintiffs brought this action in a complaint dated October 5, 2005, seeking damages in an amount not less than $100MM USD and specific performance of the agreement or, in the alternative, the modified agreement. (Compl. ¶¶ 15-21, Wherefore Clause.) Defendant answered on October 25, 2005, admitting that Messrs. O'Neill and Khosla spoke by telephone on or about April 8 and April 13, 2005 (Ans. ¶¶ 10-11), denying the remainder of plaintiffs' substantive allegations (Ans. ¶¶ 9-21), and raising a number of affirmative defenses, including *forum non conveniens* (Ans. Affir. Defs. ¶ 2). Defendant brought this motion for *forum non conveniens* on January 27, 2006, and the motion was fully briefed on February 28, 2006.

11

## DISCUSSION[5]

### I. *Forum Non Conveniens* Dismissal Standards

The doctrine of *forum non conveniens* is based on the principle that "'a court may resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute.'" Norex Petroleum Ltd. v. Access Indus., Inc., 416 F.3d 146, 153 (2d Cir. 2005) (quoting Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 507 (1947)); In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India in Dec., 1984, 634 F. Supp. 842, 845 (S.D.N.Y. 1986) (Keenan, J.) ("The doctrine of *forum non conveniens* allows a court to decline jurisdiction, even when jurisdiction is authorized by a general venue statute."), aff'd, 809 F.2d 195 (2d Cir. 1987). Notwithstanding the propriety of the action under the venue statute, "dismissal will ordinarily be appropriate where trial in the plaintiff's chosen forum imposes a heavy burden on the defendant or the court, and where the plaintiff is unable to offer any specific reasons of convenience supporting his choice." Piper Aircraft Co. v. Reyno, 454 U.S. 233, 249 (1981). The Supreme Court has declined to fashion the exact circumstances that would "'justify or require either grant

---

[5] While a district court normally must first determine whether it retains subject matter jurisdiction over a dispute, the Second Circuit has held that a district court may decide a motion for dismissal on *forum non conveniens* grounds without first establishing its subject matter jurisdiction. In re Arbitration between Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine, 311 F.3d 488, 497-98 (2d Cir. 2002). This decision was based on the Supreme Court's acknowledgement that "some of its precedents have 'diluted the absolute purity of the rule that Article III jurisdiction is always an antecedent question.'" Id. at 497 (quoting Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 101 (1998)). It went on state that it had read the Supreme Court's decision in Steel Co. as "'barr[ing] the assumption of 'hypothetical jurisdiction' only where the potential lack of jurisdiction is a constitutional question.'" Id. (quoting Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 816 n.11 (2d Cir. 2000)) (bracket in original). Because the jurisdictional challenge before it concerned statutory requirements, and not any constitutional requirement, the Court turned to the *forum non conveniens* objection. Id. at 498. The Court adopted the reasoning of the District of Columbia Circuit:

> "Forum non conveniens does not raise a jurisdictional bar but instead involves a deliberate abstention from the exercise of jurisdiction. . . . While such abstention may appear logically to rest on an assumption of jurisdiction, . . . it is as merits-free as a finding of no jurisdiction. By the same principle on which the [Supreme] Court has approved a discretionary declination to exercise a pendent jurisdiction that may not have existed, . . . it would be proper to dismiss on such grounds (if meritorious) without reaching the FSIA issue. Similarly, dismissal for want of personal jurisdiction is independent of the merits and does not require subject-matter jurisdiction."

Id. (quoting In re Minister Papandreou, 139 F.3d 247, 255-56 (D.C. Cir. 1998)) (footnote omitted in original).

or denial of remedy.'" Id. (quoting Gilbert, 330 U.S. at 508). Consequently, a district court's inquiry is highly fact-specific. Id. ("'Each case turns on its facts.'" (quoting Williams v. Green Bay & W.R. Co., 326 U.S. 549, 557 (1946))); Walpex Trading Co. v. Yacimientos Petroliferos Fiscales Bolivanos, 712 F. Supp. 383, 392-93 (S.D.N.Y. 1989) (Leisure, J.) ("The Supreme Court has emphasized the flexibility with which the District Court must approach a *forum non conveniens* determination, and consequently there are no specific circumstances which would require either a grant or denial of the remedy.").

In furtherance of these general principles of law, the Second Circuit has crafted a three-step inquiry for its district courts to follow:

> At step one, a court determines the degree of deference properly accorded the plaintiff's choice of forum. At step two, it considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute. Finally, at step three, a court balances the private and public interests implicated in the choice of forum.

Norex Petroleum Ltd. v. Access Indus., Inc., 416 F.3d 146, 153 (2d Cir. 2005) (citing Iragorri v. United Techs. Corp., 274 F.3d 65, 73-74 (2d Cir. 2001) (en banc)). A defendant moving for dismissal on *forum non conveniens* grounds bears the burden of proof. Aguinda v. Texaco, Inc., 303 F.3d 470, 476 (2d Cir. 2002). Finally, the Second Circuit's review of a district court's dismissal on the basis of *forum non conveniens* is "severely cabined." Alfadda v. Fenn, 159 F.3d 41, 45 (2d Cir. 1998). The specific standards for each of these three steps follow.

### A. Step One: Determining the Degree of Deference Due a Plaintiff

The Second Circuit, sitting en banc in Iragorri v. United Technologies Corp., 274 F.3d 65, 70-72 (2d Cir. 2001) (en banc), refined the analysis that a district court should undertake when determining what deference a plaintiff's choice of forum should be given. The specific

13

question in Iragorri was what degree of deference should be accorded to a plaintiff that resides in the United States but brings suit in a district court other than the one in which the plaintiff resides. Id. at 71.

Looking to Supreme Court precedent, the Second Circuit observed that, generally speaking, a court should defer to a plaintiff's choice of forum. Id. at 70; see also Piper Aircraft Co. v. Reyno, 454 U.S. 233, 255 (1981) ("[T]here is ordinarily a strong presumption in favor of the plaintiff's choice of forum."); Koster v. (Am.) Lumbermens Mut. Cas. Co., 330 U.S. 518, 525 (1947) ("While, even in the ordinary action, the residence of the suitor will not fix the proper forum without reference to other considerations, it is a fact of 'high significance.'" (quoting Int'l Milling Co. v. Columbia Transp. Co., 292 U.S. 511, 520 (1934))). However, such deference is not dispositive. Iragorri, 274 F.3d at 71. For instance, a plaintiff who files suit in its home forum does not, per se, defeat a motion to dismiss for *forum non conveniens* by virtue of being in its home forum. Id.; see also Piper, 454 U.S. at 255 ("[A] plaintiff's choice of forum is entitled to greater deference when the plaintiff has chosen the home forum."); Alcoa Steamship Co. v. M/V Nordic Regent, 654 F.2d 147, 152 (2d Cir. 1978) (en banc) ("American citizenship alone is not a barrier to dismissal on the ground of forum non conveniens."). If the defendant is unnecessarily burdened, dismissal may still be proper. Iragorri, 274 F.3d at 71.

The converse of the heightened deference afforded a plaintiff suing in its home forum is that a lesser degree of deference is afforded a foreign plaintiff who brings suit in a United States forum. Id.; see Piper, 454 U.S. at 256 ("When the home forum has been chosen, it is reasonable to assume that this choice is convenient. When the plaintiff is foreign, however, this assumption is much less reasonable."). Synthesizing these two general rules, the Second Circuit held that Supreme Court precedent stands for "a broader principle under which the degree of deference to

14

be given to a plaintiff's choice of forum moves on a sliding scale depending on several relevant

considerations." Iragorri, 274 F.3d at 71. Looking to the Supreme Court's decision in Piper

Aircraft Co. v. Reyno, the Court articulated the following test:

> The more it appears that a domestic or foreign plaintiff's choice of forum has been
> dictated by reasons that the law recognizes as valid, the greater the deference that
> will be given to the plaintiff's forum choice. Stated differently, the greater the
> plaintiff's or the lawsuit's bona fide connection to the United States and to the
> forum of choice and the more it appears that considerations of convenience favor
> the conduct of the lawsuit in the United States, the more difficult it will be for the
> defendant to gain dismissal for *forum non conveniens.*

Id. at 71-72 (footnotes omitted). The factors favoring denial of a motion for dismissal

include

> the convenience of the plaintiff's residence in relation to the chosen forum, the
> availability of witnesses or evidence to the forum district, the defendant's
> amenability to suit in the forum district, the availability of appropriate legal
> assistance, and other reasons relating to convenience or expense.

Id. at 72. Conversely, where it appears that a plaintiff has chosen a U.S. forum because

of forum-shopping reasons, less deference will be afforded plaintiff's choice and,

consequently, the greater the likelihood of dismissal. Id. Such forum-shopping reasons

include

> attempts to win a tactical advantage resulting from local laws that favor the
> plaintiff's case, the habitual generosity of juries in the United States or in the
> forum district, the plaintiff's popularity or the defendant's unpopularity in the
> region, or the inconvenience and expense to the defendant resulting from
> litigation in that forum.

Id.; see, e.g., Pollux Holding Ltd. v. Chase Manhattan Bank, 329 F.3d 64, 71 (2d Cir.

2003) (Cardamone, J.) ("In such circumstances, it is more likely that forum-shopping for

a higher damage award or for some other litigation advantage was the motivation for

plaintiff's selection."). In sum, in assessing what deference should be accorded a United

States resident who brings suit in a forum other than its home forum, a district court must

15

look to the plaintiff's "likely motivations in light of all the relevant indications." Id. at 73. Knee-jerk decisions that rely on only one consideration are prohibited. See Norex Petroleum Ltd. v. Access Indus., Inc., 416 F.3d 146, 155 (2d Cir. 2005) ("[W]here, as in this case, a court references a single factor, geographic convenience, to the exclusion of others more supportive of plaintiff's forum choice, a legal concern arises as to whether its exercise of discretion was properly directed to the application of Iragorri's sliding scale of deference.")

## B. Step Two: Whether an Adequate Alternative Forum Exists

The second step of a *forum non conveniens* analysis requires a district court to determine whether a suitable alternative forum for the dispute exists. Iragorri, 274 F.3d at 73; see Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254 n.22 (1981) ("At the outset of any *forum non conveniens* inquiry, the court must determine whether there exists an alternative forum."); see also Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 507 (1947) ("In all cases in which the doctrine of forum non conveniens comes into play, it presupposes at least two forums in which the defendant is amenable to process . . . ."). The movant bears the burden of demonstrating that an adequate alternative forum exists. Bank of Credit and Commerce Int'l (OVERSEAS) Ltd. v. State Bank of Pak., 273 F.3d 241 248 (2d Cir. 2001). A suitable alternative forum exists where (1) the defendant is "'amenable to process'" in the other jurisdiction, Piper, 454 U.S. at 254 n.22 (quoting Gilbert, 330 U.S. at 506-07); Peregrine Myanmar Ltd. v. Segal, 89 F.3d 41, 46 (2d Cir. 1996) (finding alternative forum appropriate where plaintiffs did not dispute that the alternative forum's courts could maintain jurisdiction over the parties); Transunion Corp. v. Pepsico, Inc., 640 F. Supp. 1211, 1215 (S.D.N.Y. 1986) (Weinfeld, J.) ("No claim is made that the Philippines lacks jurisdiction to hear this case."), aff'd, 811 F.2d 127 (2d Cir. 1987) (per curiam); In re

Union Carbide Corp. Gas Plant Disaster at Bhopal, India in Dec., 1984, 634 F. Supp. 842, 845

(S.D.N.Y. 1986) (Keenan, J.) (citing Piper with approval), aff'd, 809 F.2d 195 (2d Cir. 1987),

and (2) the alternative forum can provide a satisfactory remedy to the plaintiff, Piper, 454 U.S. at

254 n.22 ("[W]here the remedy offered by the other forum is clearly unsatisfactory, the other

forum may not be an adequate alternative, and the initial requirement may not be satisfied. . . .

[F]or example, . . . where the alternative forum does not permit litigation of the subject matter of

the dispute.");[6] Accordia Ne., Inc. v. Thesseus Int'l Asset Fund, N.V., 205 F. Supp. 2d 176, 179

(S.D.N.Y. 2002) (denying dismissal, *inter alia*, on the ground that the proposed alternative forum

of Kosovo "may be lacking even the rudiments of the rule of law").

Where a district court cannot definitively determine the adequacy of the foreign forum,

the Second Circuit advises that the court can still dismiss the case with the condition that the

plaintiff be able to reinstate the case if the alternative forum declines to assume jurisdiction.

Bank of Credit and Commerce Int'l (OVERSEAS) Ltd. v. State Bank of Pak., 273 F.3d 241,

247-48 (2d Cir. 2001). The Second Circuit has further advised that such a conditional dismissal

does not relieve a district court of first trying to determine whether foreign forum is indeed

adequate:

> [T]he district court may dismiss on *forum non conveniens grounds,* despite its
> inability to make a definitive finding as to the adequacy of the foreign forum, if
> the court can protect the non-moving party by making the dismissal conditional.
> This case law does not, however, excuse the district court from engaging in a full
> analysis of those issues of foreign law or practice that are relevant to its decision,
> or from closely examining all submissions related to the adequacy of the foreign
> forum. If, in the end, the court asserts its "justifiable belief" in the existence of an

---

[6] In Piper Aircraft Co. v. Reyno, the Supreme Court held that a plaintiff may not defeat a motion to dismiss for *forum non conveniens* on the sole ground that the substantive law to be applied in the alternative forum is less favorable than the law that would be applied in the present forum. 454 U.S. 233, 247-55 (1981). While this lone consideration cannot be determinative on a defendant's motion, the Court made clear that this did not mean an unfavorable change of law should never be a consideration weighed by a district court. Id. at 254. Indeed, "if the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all, the unfavorable change in law may be given substantial weight; the district court may conclude that dismissal would not be in the interests of justice." Id.

17

adequate alternative forum, it should cite to evidence in the record that supports that belief.

Id. (footnote omitted). A district court might also condition dismissal on the willingness of the foreign court to hear the case, the defendant's consent to jurisdiction in the alternative forum, and the defendant's waiver of any statute of limitations defense that may have arisen since the filing of the case in the present forum. Calavo Growers of Cal. v. Generali Belg., 632 F.2d 963, 968 (2d Cir. 1980).

## C. Step Three: The Balancing of Gilbert's Public and Private Interest Factors

Assuming an adequate alternative forum exists, a district court must balance two sets of factors to determine whether adjudication is more appropriate in the present forum or the alternative forum. See Pollux Holding Ltd. v. Chase Manhattan Bank, 329 F.3d 64, 75 (2d Cir. 2003) (Cardamone, J.) ("The next issue under Gilbert is to weigh defendant's hardships if jurisdiction is retained in the forum of plaintiff's choice against plaintiff's hardships if the motion to dismiss is granted and plaintiff is forced to begin suit anew in a different forum."); see also Alcoa Steamship Co. v. M/V Nordic Regent, 654 F.2d 147, 151 (2d Cir. 1978) (en banc) ("[M]ore than the private convenience interests of the litigants—and much more than the plaintiff's subjective intent—should be considered by the federal courts in acting on forum non conveniens motions. The interests of justice and court efficiency also must be weighed.")

### 1. Private Interest Factors

The first set of factors, the private interest factors, address the conveniences to the litigants. They include

"the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive."

18

Iragorri v. United Techs. Corp., 274 F.3d 65, 73-74 (2d Cir. 2001) (en banc) (quoting Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947)). A district court, in its analysis, essentially weighs the difficulties a defendant would suffer if the dispute were adjudicated in the present forum against the difficulties a plaintiff would face if the case were dismissed and the plaintiff were thus forced to bring suit in another country. Id. at 74. Of critical importance to a court's duties in this analysis, the Second Circuit advises, is the need to weigh the conveniences and hardships of the parties with a proper understanding of what issues are likely to arise at trial: "Rather than simply characterizing the case as one in negligence, contract, or some other area of law, the court should focus on the precise issues that are likely to be actually tried . . . ." Id.; see, e.g., Blimpie Int'l, Inc. v. ICA Menyforetagen AB, No. 96 Civ. 3082, 1997 WL 143907, at *7 (S.D.N.Y. Mar. 25, 1997) (stating that where fiduciary duty arose in New York, but breach of such duty occurred by way of actions taken in Sweden, Sweden was a more appropriate forum because the bulk of proof relating to the breach was housed there). For example, the Second Circuit hypothesized that in a negligence action a district court's disposition of a *forum non conveniens* motion would vary depending on whether the alleged negligence was of an actor at the scene of an accident, or whether the accusation of negligence concerned the design or manufacture of equipment that took place in another country. Iragorri, 274 F.3d at 74. Finally, the Court noted that an assessment of whether damages were disputed, and which forum would have easier access to evidence concerning such damages, should also be considered. Id.

## 2. Public Interest Factors

A district court is further directed to weigh certain factors that concern the public's interest, including (1) any administrative difficulties that may arise if an alternative forum is particularly congested with litigation; (2) the consideration that jurors should not be obligated to

19

decide disputes with no relation to their community; (3) the fact that where a case affects many people, a forum that allows those affected to view the suit, rather than learn of it by report from a foreign forum, is preferable; (4) the forum's local interest in having its own controversies decided at home; and (5) the potential pitfalls that stem from a diversity case being heard in a foreign forum that must resolve conflicts of law and substantive law problems, rather than a forum familiar with the state law to be applied to the case. Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508-09 (1947); Iragorri, 274 F.3d at 74.

In sum, depending on the facts of the case, while a plaintiff's citizenship and residence is helpful to a court in that it allows it to set the appropriate degree of deference due the plaintiff, the gravity of the private and public interest factors at stake may be determinative. Iragorri, 274 F.3d at 74; Alcoa Steamship Co. v. M/V Nordic Regent, 654 F.2d 147, 154 (2d Cir. 1978) (en banc) ("The trend of both the common law generally and admiralty law in particular has been away from according a talismanic significance to the citizenship or residence of the parties."). At the end of the day, "[t]he action should be dismissed only if the chosen forum is shown to be genuinely inconvenient and the selected forum significantly preferable." Iragorri, 274 F.3d at 74-75. In so doing, the court shall look at the greater convenience afforded a defendant allowed to litigate in its preferred forum, and weigh such convenience against any potentially *greater* inconvenience suffered by plaintiff in such alternative forum. Id. at 75. A district court must not ignore the reality that, just as plaintiffs are susceptible to forum shopping, so too are defendants who move for dismissal on *forum non conveniens* grounds not because of a bona fide concern for convenience, but as a result of a more insidious forum-shopping motive. Id.; see also id. ("District courts should therefore arm themselves with an appropriate degree of skepticism in

20

assessing whether the defendant has demonstrated genuine inconvenience and a clear preferability of the foreign forum.").

II.    *Forum Non Conveniens* Principles as Applied to the Parties' Arguments

A.    What Degree of Deference Is Plaintiffs' Choice of the Southern District of New York Due?

Plaintiffs argue that they satisfy the factors that evidence a forum choice based on true convenience. They argue that (1) while they are foreign corporations, plaintiffs can only act through their agent and investment advisor, SVP, who maintains its office in New York and entered into the subject agreement on their behalf from New York (Pl.'s Mem. Law Opp'n Mot. at 9-10); (2) necessary witnesses and evidence can both be made available in this district (Pl.'s Mem. Law Opp'n Mot. at 10); (3) defendant is registered to do business in New York and is thus amenable to suit in New York (Pl.'s Mem. Law Opp'n Mot. at 10-11); (4) plaintiffs' counsel is located in New York; and (5) litigation in England would essentially shift any inconvenience and expense that defendant will incur in this forum to plaintiffs (Pl.'s Mem. Law Opp'n Mot. at 11). Before turning to these arguments, the Court first turns to a preliminary consideration which it believes raises a strong inference that forum-shopping reasons motivated plaintiffs' choice of forum.[7]

As foreign corporations, plaintiffs can properly invoke this Court's diversity jurisdiction by bringing suit against an American business entity—to wit, CFSC, a Delaware corporation. 28 U.S.C. § 1332(a)(2) (2000). Plaintiffs cannot, however, bring suit in this Court—or any other

---

[7] Because the Court enjoys "broad discretion" in reviewing this type of motion, Iragorri v. United Techs. Corp., 274 F.3d 65, 72 (2d Cir. 2001) (en banc) ("The decision to dismiss a case on *forum non conveniens* grounds 'lies wholly within the broad discretion of the district court and may be overturned only when we believe that discretion has been *clearly abused.*'" (quoting Scottish Air Int'l, Inc. v. British Caledonian Group, PLC, 81 F.3d 1224, 1232 (2d Cir. 1996))), the Court first turns to this consideration, rather than plaintiffs' arguments, because it is extremely probative of forum-shopping motives. Further, the Second Circuit in Iragorri used language indicating that its list of factors to be used when determining what deference should be given a plaintiff's choice of forum is non-exhaustive. Id. ("Thus, factors that argue against *forum non conveniens* dismissal *include* . . . .") (emphasis added).

21

district court—where another foreign entity is named as the primary defendant, as such party would destroy diversity.[8]  Id. § 1332. The fact that CFM, an English corporation, is not named as a defendant in this suit is, therefore, not a mystery because its inclusion would destroy diversity. However, as set forth above, CFM is the indirect holder of an interest in the equity that lies at the center of this dispute, while CFSC maintains no interest in TPL's equity. CFM, therefore, would appear to be the real party in interest to this suit.

Plaintiffs' decision to bring their action against CFSC alone, then, was rational if they thought they had entered into a contract with CFSC. Facts borne out in the early stages of discovery, however, raise a strong inference that this was not the case. Plaintiffs have produced in discovery a draft "Trade Confirmation" document prepared by SVP after the alleged oral contract was formed. (Kahnke Decl. Exs. F, G.) The document preliminarily memorializes the parties' oral agreement subject to the subsequent execution of a final agreement containing all of the terms of the deal. The Trade Confirmation was drafted by a SVP employee and sent by e-mail to Jason Clarke at SVP-U.K. The document names "Cargill Financial Markets" as the seller and plaintiffs as buyers. This fact serves as strong evidence that plaintiffs believed, in at least May 2005, that they were contracting with CFM.[9]  Because plaintiffs knew that they were contracting with CMF, it is more than reasonable to believe that they knew CMF was the holder

---

[8] Plaintiffs do not argue, nor would the Court find, that this Court could maintain subject matter jurisdiction if CFM were joined as a defendant. While § 1332(a)(3) states that a district court's subject matter jurisdiction is satisfied where the suit is between "citizens of different States and in which citizens or subjects of a foreign state are additional parties," 28 U.S.C. § 1332(a)(3), courts in this Circuit have held that diversity jurisdiction fails where an alien brings suit against another alien and a U.S. citizen. Fosen v. United Techs. Corp., 484 F. Supp. 490, 495 n.4 (S.D.N.Y.) (holding that while § 1332(c), the precursor to § 1332(a)(3), "might appear to establish diversity jurisdiction over cases in which an alien sues another alien and a United States citizen, it has not been so interpreted by the courts or commentators."), aff'd, 633 F.2d 203 (2d Cir. 1980) ; see also IIT v. Vencap, Ltd., 519 F.2d 1001, 1015 (2d Cir. 1975) (Friendly, J.) ("Diversity jurisdiction under 28 U.S.C. s 1332 is defeated by the presence of aliens both as plaintiffs and as defendants.").

[9] It also dispels any notion that plaintiffs mistakenly believed that Mr. O'Neill worked for CFM—or any other Cargill entity—but was acting as an agent for CFSC. If that were the case, it would not follow that CFM would be the signatory to the contract.

22

of the Notes. In any regard, defendant has since produced in discovery copies of the Notes, each of which clearly names CFM as its holder. (Kahnke Decl. Ex. H.)

Given plaintiffs' awareness of which business entity they had contracted with, their decision to bring suit solely against CFSC might still be reasonable if they had reason to believe that this Court could somehow enforce the purported agreement, and issue an order of specific performance, against CFSC. New York state case law, which plaintiffs argue applies in this case, demonstrates that no such reason exists.[10] First, this Court cannot issue a decree for specific performance if effectuation of the performance sought is either impossible or would violate the rights of a third party whose interest in the equity is superior to the defendant's—*i.e.*, CFM. See, e.g., Kennedy v. Hazelton, 128 U.S. 667, 671 (1888) ("A court of chancery cannot decree specific performance of an agreement to convey property which has no existence, or to which the defendant has no title."); Joneil Fifth Ave. Ltd. v. Ebeling & Reuss Co., 458 F. Supp. 1197, 1200 (S.D.N.Y. 1978) (Weinfeld, J.) ("The rule is that '[s]pecific enforcement will not be decreed if the performance sought is impossible . . . or is in violation of the rights of a third person which are superior to those of the plaintiff.'" (quoting Restatement of Contracts § 368) (bracket and ellipsis in original), aff'd, 811 F.2d 127 (2d Cir. 1987) (per curiam); Wynyard v. Beiny, 625 N.Y.S.2d 27, 28 (App. Div. 1995) (affirming trial court's denial of specific performance as impossible where the third-party plaintiff sought to have pledge stock to it could not because the third party did not own the stock). Further, as defendant points out, plaintiffs do not argue that CFSC can be held liable for the breach of the agreement on an alter-ego theory in which CFSC is the alter ego of CFM. Nor is there any evidence before the Court that an alter

---

[10] As discussed later in this opinion, infra Discussion II.C.2.c, the Court makes no finding as to which jurisdiction's law—New York or England—would apply if the Court were to adjudicate this dispute.

ego theory's requirements[11]—which include inadequate capitalization and neglectfulness in the observation of corporate formalities on the part of CFSC, see Harper v. Del. Valley Broadcasters, Inc., 743 F. Supp. 1076, 1085 (D. Del. 1990) (setting forth the factors that weigh in favor of alter ego liability)—are present.[12]

Plaintiffs counter by arguing that "obvious" factual issues have been raised both about who owns and controls the TPL equity, and the relationships between the various Cargill entities. (See Pl.'s Mem. Law Opp'n Mot. at 20-21 & n.20). These arguments, however, do not stand up to those facts, which are clear on their face, discussed above. For instance, plaintiffs argue in a footnote that one obvious factual issue is the fact that, in his telephone conversations with Mr. Khosla, Mr. O'Neill stated that "*we own* the economic interest in those shares" and "*we are* the economic beneficiary of those shares." (Pl.'s Mem. Law Opp'n Mot. at 20 n.20 (emphasis added).) These statements, and Mr. O'Neill's use of the pronoun "we," are ostensibly offered to show that the use of a generic "we,"—either CFSC or some generic "Cargill"—owned the shares. But Mr. O'Neill's off-hand reference to a "we" being the owner of the TPL equity in a telephone conversation does not stand up to the fact that SVP named CFM as the seller of the equity in a document prepared for the purpose of memorializing the parties' intentions.

Plaintiffs also argue that there are inconsistencies between defendant's Rule 26(a) disclosures and statements on a Cargill website concerning the corporate affiliations of some of

---

[11] New York choice of law rules would dictate that the law of the state in which the corporation was incorporated applies to the question whether the corporation is the alter ego of another. Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995) ("Under New York choice of law principles, the law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders.") (internal quotation marks and brackets omitted); Kalb, Voorhis & Co. v. Am. Fin. Corp., 8 F.3d 130, 132 (2d Cir. 1993) ("The law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders . . . ."). CFSC was incorporated under Delaware law. (Def.'s Reply Mem. Law Supp. Mot. at 4 n.2.)

[12] For instance, a 2005 annual report for CFSC shows total assets of over £270MM, and total assets, less current liabilities, of £190MM. (Kahnke Decl. Ex. I.)

24

its employees.[13] They argue that these inconsistencies "provide a further basis for enforcement of a specific performance order." (Pl.'s Mem. Law Supp. Mot. at 20-21.) While not explicitly argued, this statement impliedly portrays "Cargill" as a unitary business form rather than as a global corporation comprised of a multitude of business entities with various inter-relationships between them. The further implication is that the various Cargill entities do not respect each other's corporate form because certain employees have been represented to be employees of more than one entity. Regardless, the Court need not evaluate the merits of plaintiffs' implications because the purpose of the current analysis is to determine from the parties' submissions whether plaintiffs' choice of forum was made out of genuine convenience or as a result of forum shopping. Iragorri v. United Techs. Corp., 274 F.3d 65, 71-72 (2d Cir. 2001) (en banc). Consequently, the Court looks to the evidence of plaintiffs' decision-making process before and up to its decision to file suit in this Court. As discussed above, documents from May 2005 evidence plaintiffs' acknowledgment at that time that they were contracting with CFM; any evidence of defendant's affiliates not respecting the corporate form, discovered in response to defendant's present motion, do not speak to plaintiffs' state of mind at the time of filing their lawsuit. Consequently, this argument fails.[14]

---

[13] For example, plaintiffs note that defendant's Rule 26(a) diselosures and defendant's responses to plaintiffs' interrogatories identify Messrs. Brice and Belongoff as employees of CFM, while the website identifies them as employees of Cargill Value Investment. (Pl.'s Mem. Law Opp'n Mot. at 4 & n.6.)

[14] Plaintiffs, in their opposition papers, also gloss over the issue of CFSC's ability to provide the relief they are seeking—damages and, more importantly, specific performance of the alleged contract—and the more general question of why CFSC, among other Cargill entities, was chosen as the lone defendant in this action. They first imply that they brought suit against CFSC because CFSC was the entity named in a letter written by defense counsel to Mr. Khosla in August 2005 which denied that the parties had ever reached an agreement on a trade. (Pl.'s Mem. Law Opp'n Mot. at 11.) Defendant argues that the letter was written on behalf of CFSC for another reason: It was written in response to a prior letter from SVP to *CFSC* demanding performance of the parties' contract. (Def.'s Reply Mem. Law Supp. Mot. at 3.) Another aspect of plaintiffs' opposition brief raises an inference that plaintiffs have sought to obfuscate the court as to whether CFSC is the appropriate defendant in this action: After stating in the first page of their brief that CFSC is the party who entered into an agreement with plaintiffs, but not defining CFSC as "Cargill," plaintiffs refer to the defendant in the action as "Cargill," a generic business entity that does not exist. (See, e.g., Pl.'s Mem. Law Opp'n Mot. at 1-2.)

25

The Court finds that the documentation evidencing plaintiffs' acknowledgment that they were contracting with CFM, coupled with the rather basic proposition that a court is foreclosed from issuing a decree of specific performance against a party that cannot perform the underlying contract, leads the Court to accord to plaintiffs' choice of forum less deference than it normally would give to plaintiffs who, while foreign, entered into a contract through an agent located in this forum.[15] See Capital Currency Exch., N.V. v. Nat'l Westminster Bank PLC, 155 F.3d 603, 612 (2d Cir. 1998) ("Because the real parties in interest are foreign corporations, there is not a strong presumption in favor of the plaintiffs' choice of forum.")

Plaintiffs' proffered explanations of their "bona fide connection" to this Court do not overcome the finding that their decision was motivated by forum-shopping motives. While the location of plaintiffs' agent in New York would *normally* provide such a bona fide connection, the futility of bringing their action here, as opposed to England where the proper party—CFM— could be sued, materially differentiates this case. While the fact that CFSC is amenable to suit in New York also would *normally* serve as a proper connection to this forum, the fact that there is strong evidence of plaintiffs' knowledge that CFSC is not the indirect holder of an equity interest in TPL, extinguishes this otherwise appropriate connection. Plaintiffs also argue that necessary witnesses and evidence can both be made available in this district. While it is true that documentation residing in England can be made available here, for reasons detailed below, see infra Discussion Part X, numerous fact witnesses actually cannot be compelled to appear before this court. This argument, consequently, fails. Next, the fact that plaintiffs' counsel is based in

---

[15] As CFM appears to be the real party in interest, it is not entirely clear why plaintiffs would choose to bring suit against CFSC in this forum. The fact that SVP has not had much luck in previous English litigation, though, is a strong indication that plaintiffs have sought to avoid litigating in England at all costs. As noted above, SVP holds certain ARCA debt. Consequently, it maintained a strong interest in TPHL's 2004 action in which it sought to stop the ARCA debt holders from forcing a TPL debt for TPL equity swap. (Brice Decl. ¶ 16.) The ARCA debt holders did not prevail in that action or the subsequent action they were involved in. (Brice Decl. ¶¶ 16-17.)

26

New York does not overcome the Court's finding—plaintiffs cannot procure local counsel after bringing suit for forum-shopping reasons nearby. Finally, while dismissal would effectively shift to plaintiffs the costs defendant will incur if the case is tried in this forum, this fact is not accorded much deference when, as here, there is other evidence of forum shopping.

## B. Does a Suitable Alternative Forum Exist?

Defendant has adequately demonstrated that England is a suitable alternative forum for this dispute. First, defendant is amenable to suit in England because it has submitted an agreement (Krauss Decl. Ex. 11) in which it voluntarily submits to the jurisdiction of the English courts, waiving any right it might have to contest the issue of personal jurisdiction. See R. Maganlal & Co. v. M.G. Chem. Co., 942 F.2d 164, 167 (2d Cir. 1991) ("Since MG has agreed to submit to the jurisdiction of the Indian courts as a condition of dismissal, . . . the district court did not err in concluding that India was an adequate forum."). Given this submission, plaintiffs do not address this second step in their opposition papers. (Mem. Law Opp'n Mot. at 8 n.13.) The Court finds that if defendant submits to the jurisdiction of an English court, which it has done, plaintiffs, Bermudan and Cayman Islands corporations, can properly invoke the jurisdiction of an English court to determine this breach of contract action.[16] (Davies Decl. ¶ 56.) Further, plaintiffs do not contest, and the Court agrees, that an English court would be able

---

[16] In Pollux Holding Ltd. v. Chase Manhattan Bank, for instance, the Second Circuit affirmed the district court's dismissal on *forum non conveniens* grounds where, as here, the plaintiff was a foreign entity, the proposed alternative forum was England, and the lawsuit included a breach of contract claim. 329 F.3d 64, 67, 75 (2d Cir. 2003) (Cardamone, J.) The Pollux Court noted that

> [s]ince plaintiffs have not asserted that English courts are in any way inadequate and because we have expressed high regard for those courts' fairness and commitment to the rule of law, it certainly cannot be said that it was an abuse of discretion to hold that England was an adequate alternative forum.

Id. at 75 (citing Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 101 (2d Cir. 2000)).

27

to award them damages if defendant were found liable.[17] (Davies Decl. ¶¶ 98, 103.) Because an adequate alternative forum exists, the Court turns to the third and final step under Iragorri.

## C. Do the Public and Private Interest Factors Weigh in Favor of Dismissal?

Not surprisingly, defendant and plaintiffs argue that both public and private interests weigh in favor of their arguments for dismissal and non-dismissal, respectively. The Court turns to the private interest factors.

### 1. Private Interest Factors

In evaluating the private interests of the parties, the Court is obligated to weigh the inconvenience to a defendant of maintaining the dispute in this forum against any inconvenience a plaintiff would incur if it decided to bring its suit in the defendant's alternative forum. See Iragorri, 274 F.3d at 74. The Court turns to these considerations.

#### a. Ease of Access to Evidence

Defendant argues that the overwhelming majority of evidence—both witnesses and documentation—is in England. (Def.'s Mem. Law Supp. Mot. at 15-19.) Plaintiffs, in response, argue that the majority of evidence the Court needs to decide this dispute is located in the U.S., and the rest is easily accessible from abroad. (Pl.'s Mem. Law Opp'n Mot. at 15.) This divergence in views on the location of pertinent evidence results from the parties' differing views of the scope of this dispute. The scope of this dispute is critical because the Second Circuit has held that it is imperative to understand the "precise issues" to be tried when determining the

---

[17] Defendant's English law expert opines that it is unlikely that an English court would be able to order CFM or CFSC to transfer shares in TPL because neither company directly holds any TPL equity. (Davies Decl. ¶¶ 101-02.) The Court finds that this does not, however, make an English court an inadequate forum because it is unlikely that this Court could issue an order for specific performance either. See supra Discussion II.A. Litigating this dispute in England is a superior option to litigating the suit here because plaintiffs will at least be able to bring suit against the proper defendant, CFM, in England. (Davies Decl. ¶ 93 ("There would be no jurisdictional or procedural difficulty in bringing proceedings against CFM in the English Courts since, as a company incorporated in England, it can be served here and the Claimant would have a right to proceed against it in England under Article 2 of the Judgments Regulation.").).

28

inconvenience to a defendant in the present forum, and the potential inconvenience to a plaintiff if it must bring suit in the defendant's preferred forum. Id.

Plaintiffs adopt a narrow view of their case. They argue that the only question before the Court is whether in their phone conversations Messrs. Khosla and O'Neill made the requisite expressions of intent to enter into a contract on behalf of their respective principles. See Rule v. Brine, Inc., 85 F.3d 1002, 1010 (2d Cir. 1996) (Kearse, J.) (stating that under New York law, "'[w]hat matters are the parties' expressed intentions, the words and deeds which constitute objective signs in a given set of circumstances.'" (quoting R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 74 (2d Cir. 1984))). Under this view, the two most critical fact witnesses are Messrs. Khosla and O'Neill, both of whom are located in the U.S. Plaintiff claims only three other fact witnesses are needed to decide this case. The first is Jason Clarke of SVP-U.K., who while located in England, will be made available for trial by plaintiffs. (Pl.'s Mem. Law Opp'n Mot. at 15.) The final two fact witnesses are John Brice and Gregory Belonogoff. Plaintiff claims that because they are identified on a Cargill website as directors of U.S.-based Cargill companies, they "must regularly travel here" and, therefore, will not be greatly inconvenienced by a trial in this forum. (Pl.'s Mem. Law Opp'n Mot. at 15.) The Court agrees that if Messrs. Brice and Belonogoff were the only two witnesses to be inconvenienced by a trial in this forum, this ease of access to evidence factor would most likely weigh toward denial of the motion. See, e.g., Accordia Ne., Inc. v. Thesseus Int'l Asset Fund, N.V., 205 F. Supp. 2d 176, 180 (S.D.N.Y. 2002) (denying motion for dismissal on the basis of *forum non conveniens* where, *inter alia*, "many of the key witnesses seem to be located in this country"). However, plaintiffs mischaracterize the scope of this dispute.

29

Defendant argues that its defense of this claim would require the Court to review a significantly larger universe of evidence than that necessary under plaintiffs' version of the dispute. Defendant argues that the parties did not enter into a contract—if anything, the parties reached an agreement in principle, subject to their working out the details of the transaction in a subsequent written contract. (Def.'s Mem. Law Supp. Mot. at 16). This argument, of course, is well grounded in contract formation doctrine. Winston v. Mediafare Entm't Corp., 777 F.2d 78, 80 (2d Cir. 1985) ("[I]f either party communicates an intent not to be bound until he achieves a fully executed document, no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract."); R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 74 (2d Cir. 1984) ("Under New York law, if parties do not intend to be bound by an agreement until it is in writing and signed, then there is no contract until that event occurs."); Scheck v. Francis, 260 N.E.2d 493, 494 (N.Y. 1970) ("It is well settled that, if the parties to an agreement do not intend it to be binding upon them until it is reduced to writing and signed by both of them, they are not bound and may not be held liable until it has been written out and signed."); see, e.g., Schwartz v. Greenberg, 107 N.E.2d 65, 67 (N.Y. 1952) ("It is entirely plain . . . that the parties did not intend to be bound until a written agreement had been signed and delivered.").

The most important "detail" to be worked out would be whether the equity could be extracted. (Def.'s Mem. Law Supp. Mot. at 16.) Defendant would need to call employees of both Western and Northern to testify as to whether those firms would have exercised their consent or preemption rights had CFM tried to transfer the equity; representatives of Goldman Sachs International, Deutsche Bank, and Merrill Lynch International to testify as to whether their respective firms, as the ARCA debt holders, would consent to or preempt an attempted equity transfer; and the Trustee to testify as to plaintiffs' contention that there was an understanding in

the marketplace that "Cargill" was the owner of a controlling interest in the TPL equity. (Def.'s Reply Mem. Law Supp. Mot. at 6.)

Plaintiffs argue in response that such nonparty witnesses are unnecessary because they have no knowledge concerning the contract's formation and because their subjective beliefs about whether the Shareholder Agreement would allows a transfer of equity would be inadmissible and irrelevant. (Pl.'s Mem. Law Opp'n Mot. at 16-17.) This argument clearly fails. The nonparty witnesses would not be called to testify about either their direct knowledge of whether the parties entered into an oral contract, or to provide quasi-expert opinions concerning their interpretation of the terms of the Shareholder Agreement. As defendant correctly points out (Def.'s Reply Mem. Supp. Mot. at 6), the nonparty witnesses representing the other TPL shareholders would be called to testify as to whether their respective firms would have exercised their consent or preemption rights in the event of an attempted transfer of equity—matters wholly within their personal knowledge.

These third-party witnesses also would be needed to establish defendant's interference, mistake, and impossibility defenses. (Def.'s Mem. Law Supp. Mot. at 16-17.) For instance, Eric Connor of Northern, a resident of England, would be called to testify about his communications with Mr. Clarke in order to establish defendant's defense that plaintiffs interfered with its performance of the contract; Mr. Connor and Tariq Masood of Western would be called to testify as to whether they would have exercised their consent or preemption rights so that defendant could establish its impossibility defense; and, in support of its mistake defense, defendant would likely call a representative of the Trustee to testify as to plaintiffs' claim that the understanding in the marketplace was that "Cargill" was the owner of the controlling equity interest in TPL. (Def.'s Reply Mem. Law Supp. Mot. at 6.)

31

The Court also agrees with defendant's argument that, if defendant were found to be liable, the Court would need to review a body of largely English evidence in order to fashion appropriate remedies. (Def.'s Mem. Law Supp. Mot. at 17.) This fact weighs in favor of dismissal.[18] See Iragorri, 274 F.3d at 74 ("The court should consider also whether the plaintiff's damages are genuinely in dispute and where the parties will have better access to the evidence relating to those damages.") While it appears unlikely that this Court would be able to issue a decree of specific performance in plaintiffs' favor, if it could the Court would first need to determine whether the other TPL shareholders, and the ARCA debt holders, would consent to the equity transfer. (Def.'s Mem. Law Supp. Mot. at 17.) This would require hearing from representatives of those companies, all of whom are in England. The Court further agrees that it would likely need to ascertain the TPL equity's worth in order to assess plaintiffs' damages. (Def.'s Mem. Law Supp. Mot. at 17.) This, too, would require the Court to review various financial data concerning TPL, all of which is located in England. (Def.'s Mem. Law Supp. Mot. at 17.)

In sum, defendant has identified at least nine nonparty witnesses that it would like to call to testify in a trial. All nine of those witnesses reside in England. Additionally, plaintiffs do not

---

[18] The Court recognizes that the Second Circuit has held in at least one instance that a district court erred when it considered in its *forum non conveniens* analysis the inconvenience of trying the case in the American forum because certain evidence residing in India was relevant to the plaintiff's claimed damages, an issue of "secondary importance" to the primary consideration of whether the underlying contract was breached. R. Maganlal & Co. v. M.G. Chem. Co., 942 F.2d 164, 168 (2d Cir. 1991). The Court believes the instant case is distinguishable because plaintiffs themselves have made clear to the Court that the primary remedy they seek, specific performance, is critical because damages alone would pale in comparison to assuming the control of TPL at this critical point in its life. (See, e.g., Letter from David A. Barrett, Esq., Plaintiffs' Counsel, to the Court at 1 (Dec. 15, 2005) ("Because the equity interest in the TPL plant is unique, plaintiffs seek specific performance of their agreement to buy it. Damages after the fact are a poor substitute for control over future strategic management of the asset.").) Evidence relating to remedies, therefore, is of particularly great importance. The prior Second Circuit decision relied on by the Second Circuit in R. Maganlal & Co. v. M.G. Chemical Co. further supports this theory. In Overseas Programming Cos. v. Cinematographische Commerz-Anstalt, the Second Circuit counseled that a district court be sure to "identify the basic issue in the lawsuit," which the instant district court had not done. 684 F.2d 232, 235 (2d Cir. 1982) (Newman, J.). The Court is confident that the basic issue in the instant action is whether a contract was formed. Even if the Court were to find that this question does not include the review of any evidence concerning damages, the majority of evidence concerning contract formation resides in England. See Discussion II.C.1.a-b.

contest that the overwhelming majority of documentary evidence—such as, for example, data concerning TPL's operations and the value of its equity—resides in England. Where most of the witnesses and documentary evidence reside in a foreign country, conducting trial in the U.S. could impose such significant burdens on the parties that dismissal is favored. See Capital Currency Exch., N.V. v. Nat'l Westminster Bank PLC, 155 F.3d 603, 611 (2d Cir. 1998) (holding that the parties might be significantly burdened by a trial in the U.S. where "most of the witnesses in this case reside in England, and the cost of transporting these witnesses to New York could be enormous. . . . [and] most of the documentary evidence in the case was created, and is stored, in England"); Calavo Growers of Cal. v. Generali Belg., 632 F.2d 963, 967 (2d Cir. 1980) (finding that dismissal was favored where almost all witnesses resided in Europe, the documents concerning the negotiation of the disputed contract were located in Belgium, and, with the exception of two individuals, no essential witnesses were located in New York).

      b.     The Availability of Compulsory Process for the Attendance of

                Unwilling Witnesses and the Cost of Obtaining Willing Witnesses

The Court is obligated to weigh the costs defendant would incur in obtaining willing witnesses to appear at a trial in the present forum. Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947); Iragorri, 274 F.3d at 74. Defendant claims, and plaintiffs do not dispute, that all but two party-witnesses and a few relevant documents are located in England. (Def.'s Mem. Law Supp. Mot. at 15.) Defendant further claims that the costs it will incur increase significantly when you take into account all of the additional English nonparty witnesses and documentary evidence under their control in England, which is essential to both defendant's case and, if defendant is found to be liable, the Court's determination of damages.[19] (Def.'s Mem. Law Supp. Mot. at 17-

---

[19] While the Gilbert Court called for a district court's consideration of the "cost of obtaining attendance of willing, witnesses," the Court also stated that the district court should also consider "all other practical problems that make

33

18; Def.'s Reply Mem. Law Supp. Mot. at 6.) As noted above, plaintiffs do not dispute that only two party-witnesses reside in the United States. They instead argue that, notwithstanding this fact, the costs Cargill would incur are not so oppressive as to warrant dismissal of the case. (Pl.'s Mem. Law Opp'n Mot. at 15.)

Because it is undisputed that the overwhelming majority of witnesses and documentary evidence reside in England, the only question before the Court is whether the costs defendant will incur in procuring such evidence for a trial in this forum are great enough to weigh in favor of dismissal. A district court is afforded broad discretion when deciding a motion for dismissal on *forum non conveniens* grounds, Piper Aircraft Co. v. Reyno, 454 U.S. 235, 257 (1981), and its decision will only be reversed where the Second Circuit determines that it clearly abused its discretion, Pollux Holding Ltd. v. Chase Manhattan Bank, 329 F.3d 64, 70 (2d Cir. 2003). Consequently, there is no fixed tipping point at which a defendant's costs become so great as to warrant dismissal.[20] Instead, the Court should apply a comparative approach that evaluates, on the one hand, the costs that defendant would incur in the present forum, versus the costs plaintiffs would incur in the foreign forum. Iragorri, 274 F.3d at 74 ("[T]he court is necessarily engaged in a comparison between the hardships defendant would suffer through the retention of

---

trial of a case easy, expeditious and inexpensive." Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947). Consequently, while the title of this section includes the "Cost of Obtaining Willing Witnesses," the Court considers, per Gilbert's command to consider other problems that would make a trial expensive, the other, additional costs defendant would incur.

[20] Because such a tipping point cannot be quantified, the Second Circuit will generally affirm a district court's dismissal where the district court found that the defendant's cost of putting on its case would be high. See, e.g., Capital Currency Exch., N.V. v. Nat'l Westminster Bank PLC, 155 F.3d 603, 611 (2d Cir. 1998) (affirming district court's dismissal where "most" party-witnesses were in England, the cost of transporting such witnesses could be "enormous," certain employees of a nonparty were in England, and "most" documentary evidence was in England); Alfadda v. Fenn, 159 F.3d 41, 47 (2d Cir. 1998) (finding the district court did not abuse its discretion by dismissing the case where "the cost for witnesses to attend trial will be significantly lessened if trial is held in France because almost all the entities involved are based there"); Schertenleib v. Traum, 589 F.2d 1156, 1165 (2d Cir. 1978) (affirming district court's dismissal where *all* of the prospective witnesses, minus defendant himself, either resided in the alternative forum of Switzerland or in other European countries, the cost of bringing such witnesses to the U.S. would be prohibitive even if they agreed to come, and relevant documentary evidence was, "for the most part," in Switzerland).

34

jurisdiction and the hardships the plaintiff would suffer as the result of dismissal and the obligation to bring suit in another country.").

While there are only two American party-witnesses in this litigation, a fact that might normally weigh in favor of dismissal, there are only three other foreign defendants, one of whom, Jason Clarke of SVP-U.K., plaintiff has agreed to bring before the Court. (Pl.'s Mem. Law Opp'n Mot. at 15.) Consequently, defendant has only identified two key party-witnesses that it will have to bring to New York from London. (Pl.'s Mem. Law Opp'n Mot. at 15.) Because defendant leaves open the possibility that it may call additional foreign party-witnesses (Pl.'s Mem. Law Opp'n Mot. at 15),[21] the Court cannot at this juncture ascertain what the cost would be to bring such willing witnesses before the Court. As to the documentary evidence, the Court is mindful of plaintiffs' argument—and the courts' recognition—that certain documents' existence in a foreign jurisdiction does not necessarily weigh in favor of dismissal because in our modern era documents are easily transportable. Georgiadis v. First Boston Corp., No. 92 Civ. 9137, 1994 WL 392229, at *3 (S.D.N.Y. Sept. 6, 1994) (Leisure, J.) (stating that "contractual documents can more easily be transferred from one forum to another"). However, the Second Circuit has frequently weighed in favor of dismissal where, as here, "all but a few" relevant documents are located in a foreign jurisdiction.[22] Regardless, even if the Court were to find that

---

[21] Defendant's memorandum of law in support of its motion only includes a non-exhaustive list:
There are only two American witnesses, O'Neill (who lives in Minnesota) and Khosla, and according to plaintiffs' Rule 26(a) disclosures, even Khosla is no longer in New York. Everyone else involved in this dispute is in England. These are employees and representatives of SVP, including Clarke; employees of CFM, *including* Brice and Belonogoff; employees or officers of the other existing and former TPL shareholders; and employees of U.K. investment banks.
(Def.'s Mem. Law Supp. Mot. at 15) (emphasis added).

[22] Plaintiffs seek to distinguish the instant case from other cases in which the majority of relevant evidence was located in a foreign jurisdiction (Pl.'s Mem. Law Opp'n Mot. at 20) by arguing that in those cases dismissal was only favored because the cost of procuring the foreign evidence, when weighed relative to the damages sought, was prohibitively costly. See Tel. Sys. Int'l Inc. v. Network Telecom PLC, 303 F. Supp. 2d 377, 383 (S.D.N.Y. 2003). Here, plaintiffs argue, the purchase price was £35MM or £50MM, depending on whether the original agreement or modified agreement is enforced, and the damages sought exceed £100MM. (Pl.'s Mem. Law Opp'n Mot. at 20.) Even if a district court opinion from this circuit were binding upon this court, which it is not, Hawkins v. Steingut,

---

35

the defendant's costs did not rise to a level warranting dismissal, the lack of compulsory process over so many foreign nonparty witnesses tips the scale in favor of dismissal.

The fact that defendant's nonparty witnesses are not subject to the Court's compulsory process weighs heavily in favor of dismissal. See Pollux, 329 F.3d at 75 (affirming district court's determination that lack of availability of compulsory process weighed heavily in favor of dismissal where defendant "identified several key witnesses whose testimony can be compelled only in England while plaintiffs have not demonstrated that any material witnesses would be unavailable there"); Capital Currency Exch., N.V. v. Nat'l Westminster Bank PLC, 155 F.3d 603, 611-12 (2d Cir. 1998) (finding England a more appropriate forum where crucial witnesses were not subject to compulsory process in the U.S. but were subject to compulsory process in England); Fitzgerald v. Texaco, Inc., 521 F.2d 448, 451-52 (2d Cir. 1975) (holding England to be a more appropriate forum because its courts could compel nonparty witnesses' appearances, while the Southern District of New York lacked such power). Plaintiffs argue that the ability to take the nonparty witnesses' depositions by letters rogatory pursuant to the Hague Convention,

---

829 F.2d 317, 321 (2d Cir. 1987) ("[A] district court decision does not 'clearly establish' the law even of its own circuit, much less that of other circuits. Although district judges within a particular circuit will frequently find each other's decisions persuasive, they remain free to disagree."), the Court finds it unpersuasive for other reasons. The district court opinion cited by plaintiffs in support of this argument states that "[t]he cost of transporting the foreign witnesses to New York and boarding them here would be substantial, *especially* when pitted against the backdrop of a total recovery of $250,000." Id. (emphasis added). The Court takes this determination to mean that the substantiality of the cost of procuring foreign evidence weighed in favor of dismissal regardless of the total recovery sought; however, when taking the total recovery sought into account, it, *a fortiori*, weighed in favor of dismissal. The import to the instant case is that where, due to the fact that the majority of evidence must be procured from a foreign country, a substantial cost is passed on to a defendant in order to put on its case, a district court may weigh this fact in favor of dismissal. Where that cost constitutes a relatively large proportion of the recovery sought, it may receive even greater weight in favor of dismissal. This finding is buttressed by the relevant Second Circuit case cited by the district court in support of the proposition. The Second Circuit held that the potentially "enormous" cost of transporting witnesses and documentary evidence from England to New York "might impose significant burdens on the parties," thus weighing in favor of dismissal. Capital Currency Exch., N.V. v. Nat'l Westminster Bank PLC, 155 F.3d 603, 611 (2d Cir. 1998). The Court did not measure this "enormous" cost relative to the total recovery sought.

36

which process has already begun,[23] satisfies defendant's need to obtain nonparty evidence and bring it before the Court. (Pl.'s Mem. Law Opp'n Mot. at 18-19.)

The Second Circuit has held that a witness's live in-court testimony is the preferred method of presenting his or her testimony. DiRienzo v. Philip Servs. Corp., 294 F.3d 21, 30 (2d Cir. 2002). When evaluating a motion for dismissal pursuant to *forum non conveniens*, however, the availability of letters rogatory is relevant to a court's analysis.[24] Id. ("Despite the preference for live testimony, we have recognized the availability of letters rogatory as relevant in deciding whether plaintiffs' chosen forum is inconvenient."). However, where the number of nonparty witnesses is large, coupled with the Court's natural preference for live testimony and the time-consuming nature of using letters rogatory, Transunion Corp. v. Pepsico, Inc., 640 F. Supp. 1211, 1216 (S.D.N.Y. 1986) (Weinfeld, J.) ("Obtaining documents and testimony from non-parties in the Philippines would require the use of letters rogatory, a time-consuming means of obtaining discovery."), aff'd, 811 F.2d 127 (2d Cir. 1987) (per curiam), a district court's decision to weigh this factor in favor of dismissal will not be overturned. Dirienzo, 294 F.3d at 30 ("Yet considering the number of witnesses for whom these [videotape deposition] accommodations would have to be made and the preference for live testimony, the district court did not abuse its discretion when it found this factor weighs in favor of defendants."). Given defendant has

---

[23] On February 14, 2006, Magistrate Judge Michael H. Dolinger granted defendant's motion for the issuance of eight letters rogatory for (1) the production of documents from Northern, Western, Magnolia, E.ON UK Plc, Credit Suisse First Boston Europe Limited, Deutsche Bank AG, Goldman Sachs International, and Merrill Lynch International, and (2) for testimony of witnesses related to each of the foregoing companies. (Feb. 14, 2006 Order.)

[24] The Second Circuit has, in at least one instance, accepted a district court's finding that the existence of several witnesses who could not be compelled to testify in the United States weighed heavily in favor of dismissal, without raising the question whether alternative methods, such as video deposition by letters rogatory, could be used to procure such testimony. Pollux Holding Ltd. v. Chase Manhattan Bank, 329 F.3d 64, 75 (2d Cir. 2003); see also Blimpie Int'l, Inc. v. ICA Menyforetagen AB, 96 Civ. 3082, 1997 WL 143907, at *8 (S.D.N.Y. Mar. 25, 1997) (discussing the importance of the lack of compulsory process over certain nonparty witnesses without discussing the availability of obtaining testimony through the Hague Convention).

identified at least nine nonparty witnesses central to its defense, and the general preference for live testimony, the Court finds that this factor weighs heavily in favor of dismissal.[25]

c. The Court's Ability to Grant Plaintiffs' Desired Remedy of

Specific Performance

Defendant argues that another private interest factor weighs in favor of dismissal: the fact that, if the Court finds defendant to be liable, it will not be able to issue a decree of specific performance in plaintiffs' favor (Def.'s Mem. Law Supp. Mot. at 20-21), a remedy that plaintiffs claim is far more important than any award of damages because of the pressing need to take control of TPL's management. (Letter from David A. Barrett, Esq., Plaintiffs' Counsel, to the Court at 1 (Dec. 15, 2005) ("Because the equity interest in the TPL plant is unique, plaintiffs seek specific performance of their agreement to buy it. Damages after the fact are a poor substitute for control over future strategic management of the asset.").) The Court already discussed this argument when it determined the amount of deference to be accorded plaintiffs' choice of forum. See supra Discussion II.A. The Court finds that for the reasons set forth above, supra Discussion II.A, this factor also weighs in favor of dismissal.

e. Defendant's Inability to Implead Foreign Third Parties

An additional private interest that the parties do not explicitly address is the fact that defendant is foreclosed from impleading CFM, the Cargill entity it argues is the true party to the contract, if one is found to exist, or any other English third party because doing so would destroy

---

[25] Plaintiffs cite to a district court case which held that, while proceeding under the Hague Convention is not as efficient as compelling witnesses to testify, the burden faced by the defendant to proceed in such a fashion did not rise to a level warranting dismissal. Anglo Am. Ins. Group, P.L.C. v. CalFed Inc., 940 F. Supp. 554, 564 (S.D.N.Y. 1996). Plaintiffs' reliance on that decision is without force because the decision is readily distinguishable from the present factual scenario. That court found the burden imposed upon defendant to not warrant favoring dismissal because the court had not determined whether the witnesses—and documentary evidence—sought to be compelled from the other jurisdiction were relevant. Id. Therefore, the factor was inconclusive, because the court could not state that the witnesses outside of the court's subpoena power were even needed to testify. As discussed above, supra Discussion II.C.1.a, it is clear to this Court that defendant's proposed nonparty witnesses are relevant to its defense.

38

diversity. Such a fact weighs heavily in favor of dismissal, Piper Aircraft Co. v. Reyno, 454 U.S. 235, 259 (1981) ("The District Court correctly concluded that the problems posed by the inability to implead potential third-party defendants clearly supported holding the trial in Scotland."); Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 511 (1947) ("Certainly to fix the place of trial at a point where litigants cannot compel personal attendance and may be forced to try their cases on deposition, is to create a condition not satisfactory to court, jury or most litigants."); Fitzgerald v. Texaco, Inc., 521 F.2d 448, 453 (2d Cir. 1975) ("The inability to implead other parties directly involved in the controversy is a factor which weighs against the retention of jurisdiction in the Southern District of New York."), particularly where the dispute involves foreign plaintiffs, Kilvert v. Tambrands Inc., 906 F. Supp. 790, 796 (S.D.N.Y. 1995) ("A defendant's inability to implead other direct tortfeasors has been held to constitute 'clear prejudice' and thus to point strongly in favor of dismissal. Specifically, when an action involves foreign plaintiffs, as here, the argument for dismissal is even stronger." (citing Fitzgerald, 521 F.2d at 453)).

## 2. Public Interest Factors

The public's interest in a dispute must also be weighed when evaluating a motion for dismissal on *forum non conveniens* grounds. Gulf Oil Corp., 330 U.S. at 508; Iragorri v. United Techs. Corp., 274 F.3d 65, 74 (2d Cir. 2001) (en banc). The Court turns to these considerations.

### a. New York's Interest in the Dispute and Whether New York Jurors Should Be Forced to Decide the Dispute

Defendant argues that because this dispute is "English in character," England, and not New York, has the primary interest in resolving this dispute in its own courts. (Def.'s Mem. Law Supp. Mot. at 21-23.) Given both plaintiffs and defendant are foreign, defendant argues

39

that New York's—and thus the United States'—sole connection to the dispute is the fact that plaintiffs' agent was in New York when he entered into the alleged contract on plaintiffs' behalf. (Def.'s Mem. Law Supp. Mot. at 21.) On the other hand, defendant contends that England's interest in the dispute is particularly deep-seated because (1) the contract at issue is for the sale of equity in one of England's largest power plants; (2) English entities hold almost £500MM in outstanding debt related to TPL; (3) TPL's other shareholders are all English; (4) English courts have already adjudicated disputes related to the ownership of TPL; and (5) the Shareholder Agreement, Equity Agreement, and other contracts concerning TPL's ownership are governed by English law. (Def.'s Mem. Law Supp. Mot. at 23.)

Plaintiffs argue that New York has a stronger connection to the dispute than England because (1) while plaintiffs are foreign, their agent who negotiated the contract did so from New York (Pl.'s Mem. Law Opp'n Mot. at 22); (2) New York residents who are either employed by or have investments with plaintiffs have an interest in the contract being enforced in the current forum (Pl.'s Mem. Law Opp'n Mot. at 22); (3) the contract was formed entirely in the United States (Pl.'s Mem. Law Opp'n Mot. at 22); (4) defendant is registered to do business in New York and "undeniably direct[s] much business toward New York" (Pl.'s Mem. Law Opp'n Mot. at 22); and (5) because New York is the "unofficial hedge fund capital of the world," it has a strong interest in adjudicating this dispute (Pl.'s Mem. Law Opp'n Mot. at 22-23).

By arguing that New York residents have a greater interest in this litigation than residents of England, plaintiffs again attempt to limit the scope of the Court's inquiry to the question whether plaintiffs' and defendant's agents manifested the requisite intent to enter into a contract for the sale of the TPL equity. This view ignores the fact that the Court will need to look at English evidence and the testimony of English residents in order to assess (1) whether any

conditions precedent to contract formation existed, (2) defendant's other defenses, and, (3) if liability is established, the determination of what remedy or remedies are appropriate.

Plaintiffs quote another Southern District of New York case in support of the proposition that New York has a "substantial interest" in the litigation because "'many New York residents who are employed by or have accounts or investments with these Plaintiffs are no doubt interested in these Plaintiffs recovering millions of dollars of lost investments.'" (Pl.'s Mem. Law Opp'n Mot. at 22 (quoting Bank of Am. Corp. v. Lemgruber, 385 F. Supp. 2d 200, 238 (S.D.N.Y. 2005).) While this Court is free to disagree with the reasoning of another court in this district, Hawkins v. Steingut, 829 F.2d 317, 321 (2d Cir. 1987) ("Although district judges within a particular circuit will frequently find each other's decisions persuasive, they remain free to disagree."), the Court need not reach that point because, in the instant case, plaintiffs only argue that four of the five beneficial owners of *SVP* are New York residents, with no mention of whether any of *plaintiffs'* employees or investors are located in New York. Consequently, any injury that occurred in this district by reason of defendant's alleged breach was to plaintiffs' agent, and not plaintiffs themselves. Cf. Dirienzo v. Philip Servs. Corp., 294 F.3d 21, 32 (2d Cir. 2002) (reversing district court's dismissal of securities fraud action on *forum non conveniens* grounds where, *inter alia*, the district court failed to account for the fact that the plaintiffs' losses were not localized in the foreign forum, but instead were localized in New York); Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd., 85 F.2d 282, 307 (S.D.N.Y. 2000) (rejecting plaintiff's argument that "defendants' activities were designed to 'manipulate the United States worker's compensation market'" because it did not, in and of itself, "create an interest in this forum where there is no one here claiming any injury"). Further, the fact that four New York residents—the beneficial owners of SVP (Pl.'s Mem. Law Opp'n Mot. at 22)—have

41

an attenuated interest in this action hardly creates a public interest, particularly when weighed against the number of English companies—as well as their employees, shareholders, debt holders, and, not to mention the residents of the U.K. who receive their power from TPL—with an interest in the disposition of this dispute.

Plaintiffs next argue that the United States has a stronger interest than England in the instant dispute because "the contract was formed entirely in the United States." (Pl.'s Mem. Law Opp'n Mot. at 22.) Plaintiffs again cite two district court cases from this circuit in support of this contention. See Alnwick v. European Micro Holdings, Inc., 281 F. Supp. 2d 629, 648 (E.D.N.Y. 2003); Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. BP Amoco, P.L.C., No. 03 Civ. 0200, 2003 WL 21180421, at *9 (S.D.N.Y. May 20, 2003) (Lynch, J.). Both are distinguishable. In the first, while both parties negotiated their joint venture agreement in the U.S., plaintiffs were New York residents, the individual defendants resided in the U.S., and the defendants' due diligence was conducted in New York. Alnwick, 281 F. Supp. 2d at 631, 648. In the second, plaintiffs sought a declaratory judgment that their insurance contracts with defendants were void because defendants had made certain misrepresentations regarding their eligibility for coverage. Nat'l Union, 2003 WL 21180421, at *1. While the contracts at issue were negotiated in the U.S., the court took care to emphasize that "the conduct most directly at issue, defendants' alleged misrepresentations, took place in the United States." Id. at *9.

More importantly, there is binding appellate authority favoring dismissal in factual scenarios closer to the instant case. For example, the Second Circuit has upheld a dismissal on *forum non conveniens* grounds in a breach of contract action where the trademark license contract was made in New York. Borden, Inc. v. Meiji Milk Prods. Co., No. 90 Civ. 5611, 1990 WL 151118, at *1 (S.D.N.Y. Oct. 3, 1990), aff'd, 919 F.2d 822 (2d Cir. 1990). The foreign

42

forum had a greater interest, however, because the effects of the contract were felt there—the trademark was solely used in Japan and thus only involved Japanese consumers and markets. Id. at *4; Borden, Inc., 919 F.2d at 822 ("Examining the public interests at stake, the court found that Japan has a much greater interest in the litigation than does the United States."). "None of the issues covered by this contract or the resolution of any dispute with regard to the contract have or will have any effect on United States commerce." Id. This Court's enforcement or non-enforcement of the purported contract would, on the one hand, have an effect on the two foreign plaintiffs in that the value of their funds would ostensibly appreciate or depreciate, depending on the present value of the TPL equity. Plaintiffs do not argue that their funds' investors reside in New York and thus have a grave interest in the outcome of this dispute.[26] On the other hand, the Court's decision with respect to enforcement of the alleged contract, if it could make one at all, which it doubts, would have a colossal effect on CFM, the English entity who holds the Notes, and the various English TPL equity and debt holders, as their interests in TPL would be changed. See Blimpie Int'l, Inc. v. ICA Menyforetagen AB, No. 96 Civ. 3082, 1997 WL 143907, at *9 (S.D.N.Y. Mar. 25, 1997) ("Although Blimpie's United States profits may be affected by the resolution of this matter, the effects on the Swedish market, Swedish businesses and Swedish consumers will be greater than any attenuated effect in New York."). All of those affected parties reside in England. Consequently, New York's interest, and that of its jurors, is not sparked. Cf. DiRienzo v. Philip Servs. Corp., 294 F.3d 21, 31 (2d Cir. 2002) (holding that New York jurors have an interest in determining a claim where the injured parties in the action were

---

[26] This fact further dispels plaintiffs' argument that New York is the proper forum because it is the "unofficial hedge fund capital of the world." (Pl.'s Mem. Law Opp'n Mot. at 22-23.) Regardless of whether this assertion is true, *plaintiffs*—the parties in interest—do not reside in New York. To the extent New York has an interest in this dispute because plaintiffs' agent, SVP, and four of its beneficial owners, are located here, that interest does not compare to the public interest England has in adjudicating a dispute that will affect exponentially more of its residents who receive their power from TPL, and the various entities with financial interests in TPL.

injured in New York); Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. BP Amoco, P.L.C., No. 03 Civ. 0200, 2003 WL 21180421, at *9 (S.D.N.Y. May 20, 2003) (Lynch, J.) (finding no unfairness in burdening New York residents with jury duty over a case in which the U.S. had a significant interest).

Finally, where a plaintiff voluntarily reaches out to a foreign business entity in order to engage it in a business transaction, which plaintiffs do not dispute is the case in the instant action (Def.'s Mem. Law Supp. Mot. at 22 ("[N]either CFSC nor CFM chose to transact with SVP because SVP is located in New York—Khosla sought out CFSC on this proposed deal."); Def.'s Reply Mem. Law Supp. Mot. at 9 ("Nor do they [*i.e.*, plaintiffs] dispute that CFSC and CFM never 'entered' New York in connection with this transaction, which centers on English interests and an English asset.").), it is reasonable to expect that a dispute resulting from the transaction will be adjudicated in the forum in which the adversary resides. See Carey v. Bayerische Hypo-Und Vereinsbank AG, 370 F.3d 234, 238 (2d Cir. 2004) ("Here, the dispute is essentially over the complex terms of an investment in German real estate which plaintiff voluntarily entered into while living in Germany. In the circumstances, it was reasonable to expect that disputes over the terms of the transactions or their performance would be resolved in Germany."); DiRienzo, 294 F.3d at 32 (reversing dismissal on *forum non convenience* grounds by, for example, distinguishing the instant case from other cases in which dismissal was proper because, among other reasons, the distinguishable cases involved American plaintiffs "who sought out involvement with a foreign forum"); see also Ionescu v. E. F. Hutton & Co. (Fr.) S.A., 465 F. Supp. 139, 146 (S.D.N.Y. 1979) (Pollack, J.) ("[P]arties who choose to engage in international transactions should know that when their foreign operations lead to litigation they cannot expect always to bring their foreign opponents into a United States forum when every reasonable

44

consideration leads to the conclusion that the site of the litigation should be elsewhere." (quoting Mizokami Bros. of Ariz., Inc. v. Baychem Corp., 556 F.2d 975, 978 (9th Cir. 1977))). Consequently, this factor weighs in favor of dismissal.

b. Administrative Difficulties

This factor weighs in neither party's favor because, while this district is one of the country's busiest, Tel. Sys. Int'l, Inc. v. Network Telecom PLC, 303 F. Supp. 2d 377, 384 (S.D.N.Y. 2003) (characterizing the Southern District of New York as "a paradigmatic 'congested center' of litigation alluded to in Gilbert"); Flores v. S. Peru Copper Corp., 253 F. Supp. 2d 510, 543 (S.D.N.Y. 2002) ("Court congestion in the Southern District may have abated somewhat from the near-crisis conditions of yesteryear, but the Court's judges have many challenging cases to administer . . . ."), the Court agrees with plaintiffs (see Pl.'s Mem. Law Opp'n Mot. at 23-24), and defendant does not dispute, that there is no basis to assume how congested or not the relevant English courts are, see, e.g., Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. BP Amoco, P.L.C., No. 03 Civ. 0200, 2003 WL 21180421, at *9 (S.D.N.Y. May 20, 2003) (Lynch, J.) ("[T]here is no reason to assume that the Commercial Court in London is any less congested than the Southern District of New York, and defendants do not so argue. Thus, this factor is neutral.").

c. Choice of Law

The likelihood that the present forum would have to apply a foreign jurisdiction's law would weigh in favor of dismissal. Piper Aircraft Co. v. Reyno, 454 U.S. 233, 260 & n.29 (1981); Calavo Growers of Cal. v. Generali Belg., 632 F.2d 963, 967 (2d Cir. 1980). Dismissal in such a case obviates the prospect of misunderstanding and/or misapplying law that the foreign court is more familiar with. See Conte v. Flota Mercante Del Estado, 277 F.2d 664, 667 (2d Cir.

45

1960) (Friendly, J.) ("[T]ry as we may to apply the foreign law as it comes to us through the lips of the experts, there is an inevitable hazard that, in those areas, perhaps interstitial but far from inconsequential, where we have no clear guides, our labors, moulded by our own habits of mind as they necessarily must be, may produce a result whose conformity with that of the foreign court may be greater in theory than it is in fact.").

The determination of which forum's law applies is made by performing a choice of law analysis. When a district court assumes jurisdiction over a case on diversity grounds, it is obligated to apply the choice of law rules of the state in which it sits. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); Lee v. Bankers Trust Co., 166 F.3d 540, 545 (2d Cir. 1999). In New York, the state in which this court sits, the first step in a choice of law analysis is to determine whether an actual conflict of laws exists. Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998); In re Allstate Ins. Co. (Stolarz), 613 N.E.2d 936, 937 (N.Y. 1993) (Kaye, C.J.) ("The first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved."). If no actual conflict exists, the choice of law analysis is dispensed with, and if New York law is among the choices, a district court in New York is free to apply it. Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co., 363 F.3d 137, 143 (2d Cir. 2004); Curley, 153 F.3d at 12; Condit v. Dunne, 317 F. Supp. 2d 344, 352 (S.D.N.Y. 2004) (Leisure, J.).

Plaintiffs argue in their brief that defendant errs by arguing that English law applies to this dispute because defendant skips the required first step of determining whether a conflict even exists. (Pl.'s Mem. Law Opp'n Mot. at 13.) Plaintiffs argue that the Second Circuit has held that "[u]nder both New York and English law, a contract is formed when all of the contracting parties express an intent to be bound and where all of the essential terms of the

46

agreement have been spelled out." Int'l Minerals & Res., S.A. v. Pappas, 96 F.3d 586, 593 (2d Cir. 1996); see also Nat'l Oil Well Maint. Co. v. Fortune Oil & Gas, Inc., No. 02 Civ. 7666, 2005 WL 1123735, at *2 (S.D.N.Y. May 11, 2005) ("[T]here is no actual conflict between the law of England and the law of New York. Accordingly, a choice of law analysis is unnecessary, and New York law shall govern the breach of contract counterclaim.").

While plaintiffs may be correct in their proclamation that English and New York state law have identical contract formation principles, the scope of this dispute will require the Court to apply other and additional legal principles if it were to find that a valid contract was formed. For example, enforcement of the contract, as detailed herein, would implicate the rights of the other TPL shareholders, debt holders, and the Trustee. The various agreements among and between those third parties are governed by English law. As such, the Court would have to, at least in part, look to English law to determine how to fashion an appropriate remedy that would invariably impact those third parties. In sum, whichever court presides over this dispute will have to go beyond the threshold question whether a contract was formed, and look to whether the TPL equity can even be extracted. This latter question, and all of the attending questions of law, involve English law. This factor, therefore, does not weigh in favor of either party.

On whole, the public and private interests are largely centered in England and not the United States, and, therefore, dismissal is warranted.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss plaintiffs' complaint on *forum non conveniens* grounds is granted, conditioned on, and subject to, defendant filing with the Clerk of this Court by May 22, 2006 a document (1) appointing a firm or individual resident in London as its agent for the receipt of service of process for an action by plaintiff covering the

47

same subject matter as in the instant case; (2) representing that it will not, in an action brought by plaintiffs in an English court covering the same subject matter as in the instant case, assert or rely upon any statute of limitation defense that may have arisen since the commencement of this action up to and including May 21, 2006. (As noted above, defendant has already filed with the Clerk of this Court a document in which it agrees to voluntarily submit to the jurisdiction of the English courts, and a waiver of any right it might have to contest an English court's personal jurisdiction over defendant.) Upon the timely filing of such a document, the Clerk shall enter final judgment and close this case.

**SO ORDERED.**
**New York, New York**

March **2 2**, 2006

_Peter K. Leisure_

U.S.D.J.

48

Copies of this Opinion and Order have been mailed to:

David A. Barrett, Esq.
Boies, Schiller & Flexner LLP
570 Lexington Avenue
New York, New York 10022

Randall E. Kahnke, Esq.
Faegre & Benson LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55408

A copy of this Opinion and Order has been sent by interoffice mail to:

Hon. Michael H. Dolinger